# In the United States Court of Appeals for the Sixth Circuit

VERONICA GARDNER, ET AL., on behalf of themselves and all others similarly situated,
*Plaintiff-Appellant,*

v.

FLAGSTAR BANK, FSB.
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 2:20-cv-12061 (The Hon. Gershwin A. Drain)

## OPENING BRIEF OF PLAINTIFF-APPELLANT

TARAS KICK
TYLER DOSAJ
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, CA 90049
(818) 452-6250

MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

November 6, 2024

*Counsel for Plaintiff-Appellant*

# DISCLOSURE OF CORPORATE AFFILIATIONS

# AND FINANCIAL INTEREST

Under Sixth Circuit Rule 26.1, Plaintiff-Appellant makes the following disclosures:

1.      Are any parties a subsidiary or affiliate of a publicly owned corporation?

   **NO.**

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   **NO.**

Dated: November 6, 2024

# TABLE OF CONTENTS

Table of authorities ............................................................................................... iv

Statement in support of oral argument .................................................................. viii

Introduction ................................................................................................................. 1

Jurisdictional statement ............................................................................................. 4

Statement of the issues ............................................................................................... 4

Statement of the case .................................................................................................. 5

    I.       Regulatory background ...................................................................... 5

         A.     Hidden overdraft programs are a major source of
profits for banks ............................................................................ 5

         B.     The only way consumers can learn about the details of a
bank's overdraft program is through accurate notice ............... 11

    II.      Factual background .......................................................................... 13

    III.    Procedural history ............................................................................ 17

Standard of review ..................................................................................................... 27

Summary of argument ............................................................................................... 27

Argument ..................................................................................................................... 31

    I.       The district court erred in holding that, because Ms. Gardner
did not introduce sufficient extrinsic evidence of intent, the
ambiguity in Flagstar's contract regarding the assessment of
APPSN fees must be resolved in favor of the drafter ................ 31

         A.     Michigan law does not require extrinsic evidence to
resolve the meaning of an ambiguous contract and does
not permit the adoption of a pro-drafter canon of
construction ................................................................................. 32

         B.     The district court erred in holding it could not consider
or adopt Ms. Gardner's interpretation because she did

not introduce sufficient extrinsic evidence to support her interpretation ..............................................................................36

II. The district court likewise erred in holding that, because Ms. Gardner lacked evidence of her contractual intent, the contract's ambiguity regarding NSF fees must be resolved in favor of the drafter..........................................................................42

III. The district court's dismissal of Ms. Gardner's implied covenant claim should be reversed .................................................................44

Conclusion .........................................................................................................46

# TABLE OF AUTHORITIES

**Cases**

*Feaz v. Wells Fargo Bank, N.A.*,
745 F.3d 1098 (11th Cir. 2014)................................................................39

*Fifth Third Mortg.-MI, L.L.C. v. Hance*,
2011 WL 4501573 (Mich. Ct. App. Sept. 29, 2011)........................................ 28, 35

*Gillis v. Respond Power, LLC*,
677 F. App'x 752 (3d Cir. 2017)........................................................ 24, 39

*Gutierrez v. Wells Fargo Bank, N.A.*,
730 F. Supp. 2d 1080 (N.D. Cal. 2010)........................................................ 13

*Hall v. El-Bathy*,
2023 WL 3563021 (Mich. Ct. App. May 18, 2023) ...........................................46

*Hammond v. United of Oakland, Inc.*,
483 N.W.2d 652 (Mich. 1992)...............................................................44

*JP Morgan Chase Bank, N.A. v. First American Title Insurance Co.*,
2011 WL 5075669 (E.D. Mich. Oct. 26, 2011)................................................35

*Klapp v. United Insurance Group Agency, Inc.*,
663 N.W.2d 447 (Mich. 2003).........................................................*passim*

*Kolbe v. BAC Home Loans Servicing, LP*,
738 F.3d 432 (1st Cir. 2013) ......................................................24, 29, 39

*Komraus Plumbing & Heating Inc. v. Cadillac Sands Motel, Inc.*,
195 N.W.2d 865 (Mich. 1972)......................................................26, 37, 38

*Lloyd v. Navy Federal Credit Union*,
2018 WL 1757609 (S.D. Cal. Apr. 12, 2018) ................................................21

*Lomree, Inc. v. Pan Gas Storage, LLC*,
499 F. App'x 417 (6th Cir. 2012) ......................................................... 34, 35

*Matsushita Electric Industries, Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)......................................................................27

*Pritts v. JI Case Co,*
310 N.W.2d 261 (Mich. Ct. App. 1981)........................................................ 26, 29, 37

*PTN-NRS, LLC v. County of Wayne,*
2017 WL 4447016 (Mich. Ct. App. Oct. 5, 2017).................................................45

*Roberts v. Capital One, N.A.,*
719 F. App'x 33 (2nd Cir. 2017)........................................................................21

*Roy v. ESL Federal Credit Union,*
2020 WL 5849297 (W.D.N.Y. Sept. 30, 2020).....................................................20

*Royal Insurance Co. of America v. Orient Overseas Container Line, Ltd.,*
525 F.3d 409 (6th Cir. 2008) .....................................................................*passim*

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,*
691 F.2d 1039 (2d Cir. 1982) ......................................................................... 29, 39

*Source Associates, Inc. v. Valero Energy Corp.,*
273 F. App'x 425 (6th Cir. 2008)....................................................................31, 45

*Sun v. CM Production, Inc.,*
393 F. App'x 283 (6th Cir. 2010) ........................................................................46

*Thacker v. Ethicon, Inc.,*
47 F.4th 451 (6th Cir. 2022) ............................................................................. 27

*Tims v. LGE Community Credit Union,*
935 F.3d 1228 (11th Cir. 2019) ........................................................................... 9

*Waterworth v. Ekman,*
2016 WL 1175099 (Minn. Ct. App. Mar. 28, 2016) ..............................................33

*Wilkie v. Auto-Owners Insurance Co.,*
664 N.W.2d 776 (Mich. 2003)....................................................................... 35, 43

**Statutes**

M.C.L.A. § 440.4104.........................................................................................20

Restatement of the Law, Consumer Contracts § 2 ............................................. 40

## Other Authorities

Anthony Malakian,
*Overdraft and ATM Fees Rise, As Economy Slumps,*
American Banker, (June 1, 2008) ........................................................ 8

Black's Law Dictionary ........................................................20

Borné, Smith, & Anderson,
*Broken Banking: How Overdraft Fees Harm Consumers and*
*Discourage Responsible Bank Products* (May 2016) ....................................12

CFPB Circular 2022-06,
Unanticipated Overdraft Fee Assessment Practices............................. 7, 10, 11, 12

CFPB,
*CFPB Finds Small Debit Purchases Lead to*
*Expensive Overdraft Charges* (July 31, 2014) ..............................................7

CFPB,
*Study of Overdraft Programs: A White Paper of*
*Initial Data Findings* (June 2013) ........................................................ 6, 7

CFPB,
*Supervisory Highlights* 8 (Winter 2015)..................................................12

CFPB,
*Supervisory Highlights Junk Fees Update Special Edition*
(October 2023) ............................................................................*passim*

Corkery & Silver-Greenberg,
*Overdraft Practices Continue to Gut Bank Accounts*
*and Haunt Customers*, N.Y. Times (Feb. 28, 2016)................................. 10

Electronic Fund Transfers,
74 Fed. Reg. 59034 (Nov. 17, 2009)................................................ 7, 12

FDIC,
*Supervisory Guidance on Multiple*
*Re-Presentment NSF Fees* (Aug. 2022)..................................................12

Halperin et al.,
Center for Responsible Lending,

*Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts* (Jan. 25, 2007)............................. 9

Ian Ayres & Alan Schwartz,
*The No-Reading Problem in Consumer Contract Law*,
66 Stan. L. Rev. 545 (2014) ....................................................................... 40

Joint Guidance on Overdraft Protection Programs,
70 Fed. Reg. 9127 (Feb. 24, 2005)............................................................ 13

Marc Anthony Fusaro,
*Are "Bounced Check Loans" Really Loans? Theory, Evidence and Policy*,
50 Q. Rev. of Econ. & Fin. 492 (Nov. 2010)............................................ 6

Napoletano,
*When to Open Multiple Bank Accounts*, Forbes (Jul. 15, 2020) .................................. 6

Noguchi,
*Rising Bank Fees Squeeze Consumers*,
National Public Radio, (June 26, 2008) ............................................................. 9

OCC Bulletin 2023-12,
*Overdraft Protection Programs: Risk Management Practices*,
(Apr. 26, 2023) ............................................................................................11, 12

OCC, Payment Systems, Comptroller's Handbook............................................... 10

Overdraft Lending: Very Large Financial Institutions,
89 Fed. Reg. 13852 (proposed Feb. 23, 2024) ................................................*passim*

Payday, Vehicle Title, and Certain High-Cost Installment Loans,
82 Fed. Reg. 54472 (Nov. 17, 2017)................................................................. 8

PEW Center on the States,
*Overdraft America: Confusion and Concerns About Bank Practices*
(May 2012) ........................................................................................... 5, 7

The Pew Charitable Trusts,
*Heavy Overdrafters: A financial profile* (Apr. 2016) .................................................. 9

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The plaintiff-appellant respectfully requests an opportunity to present oral argument in this appeal. This case arises from a putative nationwide class action alleging a widespread and serious series of contractual breaches by Flagstar Bank. In the decision below, the district court determined that Flagstar's contract was ambiguous—in multiple ways—regarding its authority to assess overdraft fees on its customers. It also recognized that Michigan law controls how those ambiguities should be resolved. But instead of applying well-established rules of Michigan contract law to Flagstar's contract, the district court created, and then applied, a novel one—that an ambiguous contract must be construed in favor of the drafter unless a consumer introduces sufficient extrinsic evidence to support their interpretation. That is the exact opposite of what Michigan law requires. Oral argument is warranted because the district court's decision is wrong and in conflict with controlling Michigan contract law.

## INTRODUCTION

This case is about Flagstar Bank's practice of charging its customers overdraft fees when they have not overdrawn their accounts. Flagstar did so with two separate misleading fee practices, neither of which its customers agreed to or had any reason to anticipate. *First*, it considered customer accounts to be overdrawn even when there was plenty of money in the account at the time a consumer made a transaction. *Second*, Flagstar generated even more fees by charging multiple fees on a single overdraft attempt. When the plaintiff in this case, Veronica Gardner, authorized an $86 payment that overdrew her account, Flagstar charged her not one, but *three* $36 fees—totaling $108 on a single transaction for less than $90.

That, of course, is not how reasonable bank customers expect overdraft fees to work. As federal regulators have cautioned, consumers cannot reasonably avoid overdraft fees that they have no reason to anticipate. And because stacking overdraft fees can cause substantial harm to consumers—especially those with low incomes—banks that employ these practices must, at a minimum, plainly explain them in their account agreements to avoid deceiving customers.

But the Flagstar account agreement at issue here says nothing that could reasonably alert customers to its fee practices. On the contrary, it does just the opposite. The agreement promises customers that Flagstar will not assess overdraft fees on transactions that are covered by the available balance in a costumer's account

when the transaction is authorized—usually at the time the consumer pays a bill or makes a purchase. When calculating overdrafts, however, Flagstar assesses a fee based on the account balance when the transaction is settled, which often occurs days later. And Flagstar's contract promises to impose only "*a* non-sufficient funds fee" for each overdraft attempt the bank declines. But it takes advantage of the fact that merchants routinely resubmit payment requests multiple times in hopes of obtaining payment. Flagstar charges an additional non-sufficient funds fee every time a merchant repeats its request for payment, thus turning a single overdraft attempt into multiple fees.

The district court recognized that Flagstar's contract could "be fairly read" to only authorize Flagstar to assess an overdraft fee if there were not enough funds available in a customer's account "at the time that the consumer-merchant transaction is authorized"—regardless of the account balance "when the transaction is settled days later." MTD Op., R. 32, PageID#646–48. And it likewise held that the contract could reasonably be read to prohibit Flagstar from charging more than one non-sufficient funds fee on a single transaction. *Id.* at PageID#651. As a result, when Flagstar moved for summary judgment arguing that it did not breach its contractual promises, the district court held that Flagstar's contract was ambiguous.

That should have led the district court to deny summary judgment. In Michigan, as everywhere else, the rules for how to resolve a contractual ambiguity

are both clear and longstanding. As the Michigan Supreme Court has explained, resolving ambiguities in a contract is "a factual question … that must be decided by the jury." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). And a party can advance an interpretation of an ambiguous contract even if they do "not present any extrinsic evidence" that "favors [their] construction," *id.* at 459 n.20—which is frequently the case when what's at issue is a standardized form contract. And, where, as here, there is *no* relevant extrinsic evidence—because neither party introduced any—Michigan law applies "the rule of contra proferentem" as a "tie-breaker." *Id.* at 455. Under that doctrine, where "conventional means of contract interpretation, including the consideration of relevant extrinsic evidence" are "found wanting," the factfinder "should then construe the ambiguity against the drafter." *Id.* at 456.

The district court, however, turned these settled rules upside down. In granting summary judgment to Flagstar, it held that a consumer is barred from advancing an interpretation of an ambiguous contract without introducing extrinsic evidence of their initial understanding of the contract. Applying that rule here, the court thus refused to even *consider* Ms. Gardner's interpretation of Flagstar's ambiguous contract. And even though Flagstar also did not introduce any extrinsic evidence regarding intent, the court held that Flagstar's interpretation controlled as a matter of law—applying a rule requiring that, in the absence any relevant extrinsic

evidence, contractual ambiguities must be resolved *in favor* of the drafter. Because such an approach fundamentally misapprehends the controlling rules that apply for resolving ambiguities in a contract, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(d) because this is a putative class action in which there are more than 100 members of the proposed class, at least one proposed member is a citizen of a different state than the defendant, and the aggregate amount in controversy exceeds $5 million. SAC, R. 97, PageID#1929; Pl.'s Resp. to Second Order to Show Cause, R. 12, PageID#58 (Flagstar is a citizen of Michigan and the putative class includes, "in addition to Michigan citizens, also … citizens of Indiana, Ohio and Wisconsin."). The district court granted Flagstar's motion for summary judgment in its entirety and entered judgment in its favor on April 16, 2024. MSJ Op., R. 137; J., R. 138. Ms. Gardner timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on May 15, 2024. Notice of Appeal, R. 139. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court granted final judgment to the defendant on all claims. MSJ Op., R. 137, PageID#4472.

## STATEMENT OF THE ISSUES

**1.** Whether the district court erred in granting summary judgment to Flagstar for its assessment of overdraft fees on transactions that are covered by the available

4

balance in a customer's account when the transaction is authorized (known as "Authorize Positive, Purportedly Settle Negative" or APPSN fees) by applying a rule that an ambiguous contract must, as a matter of law, be construed in favor of the drafter if a consumer does not introduce sufficient extrinsic evidence of intent.

**2.** Whether the district court erred in granting summary judgment to Flagstar for its assessment of multiple non-sufficient fund fees (known as NSF fees) on a single overdraft attempt by applying that same rule.

**3.** Whether an implied covenant claim that was dismissed on the ground that it could not exist in the absence of a breach of contract claim should be revived if this Court reverses the grant of summary judgment on the breach of contract claims.

## STATEMENT OF THE CASE

### I. Regulatory background

#### A. Hidden overdraft programs are a major source of profits for banks.

Checking accounts are supposed to be a safe "entry point to the financial mainstream."[1] *See* PEW Center on the States, *Overdraft America: Confusion and Concerns About Bank Practices* 2 (May 2012), https://perma.cc/E3PG-CEYL ("Pew Report"). By enabling consumers to keep funds on hand to cover daily expenses, they function like cash rather than debt. *See* Napoletano, *When to Open Multiple Bank Accounts*, Forbes

---

[1] Unless otherwise specified, all internal quotation marks, citations, alterations, and emphases are omitted.

(Jul. 15, 2020), https://perma.cc/99K8-PRNA. And they provide an easy way to budget conservatively—enabling consumers to limit their spending to money they actually have as they get on their financial feet.

At least, that used to be how they worked. For instance, if a consumer's account didn't have enough money to cover a particular check or debit transaction, that transaction would simply be declined. *See* Marc Anthony Fusaro, *Are "Bounced Check Loans" Really Loans? Theory, Evidence and Policy*, 50 Q. Rev. of Econ. & Fin. 492, 493 n.4 (Nov. 2010). But just declining transactions wasn't very profitable for financial institutions. So, through "overdraft" and "non-sufficient funds" programs, they started charging hefty fees instead—anytime a consumer might dip below their account balance.

At first overdraft policies were designed to offer consumers a courtesy. Maybe, the logic went, some consumers would rather pay a fee than have a check cancelled. A financial institution could allow each consumer to temporarily overspend their account balance, and then pay itself back shortly thereafter, whenever the consumer replenished their account. *See* CFPB, *Study of Overdraft Programs: A White Paper of Initial Data Findings* 11–13 (June 2013), https://perma.cc/KTR9-TKP9 ("CFPB Study"). Whatever the merits of this idea, these programs were initially small and discretionary and implemented on an ad hoc, check-by-check basis. *See id.* at 13–16. The typical fee was only $5. *Id.*

But no longer. Today, overdraft programs are automated, and they've been broadened to apply to everything from scheduled electronic payments to debit card transactions and even ATM withdrawals. *See* CFPB Study, at 13–14. The typical overdraft fee is now about $35—seven times what it once was. Overdraft Lending: Very Large Financial Institutions, 89 Fed. Reg. 13852 (proposed Feb. 23, 2024); CFPB, *CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges* (July 31, 2014), https://perma.cc/XLC4-7LMK. That means the dollar amount of the fee imposed often exceeds the dollar amount of the overdraft. *See* CFPB, *Supervisory Highlights Junk Fees Update Special Edition* at 7 (October 2023), https://perma.cc/2HLS-7P27. And "multiple fees may be assessed in a single day for a series of small-dollar transactions." Electronic Fund Transfers, 74 Fed. Reg. 59034 (Nov. 17, 2009). As a result, before they know it, consumers can and do end up paying hundreds of dollars of fees—all for transactions they would rather have seen cancelled. *See* PEW Report, at 5.

Given this shift, what minimal benefit these overdraft programs may have once offered consumers has been lost. *See* CFPB Circular 2022-06, *Unanticipated overdraft fee assessment practices*, https://perma.cc/MK75-TAD2 ("The injury from unanticipated overdraft fees likely is not outweighed by countervailing benefits to consumers or competition."). Yet financial institutions continue to charge high overdraft fees "even though the fees far exceed institutions' costs and losses associated

with providing non-covered overdraft credit." Overdraft Lending, 89 Fed. Reg. at 13856.

To further increase profits, banks started charging non-sufficient funds (NSF) fees when consumers inadvertently attempted to overdraw their account and the bank declined a transaction because of insufficient funds. *Id.* at 13853. Some banks chose to assess multiple NSF fees on each attempted overdraft. Once a transaction didn't go through for insufficient funds, a merchant would often try again and present the same transaction to the bank for payment again. So the bank would "assess another NSF fee" for the same attempted transaction "without providing consumers a reasonable opportunity to prevent another fee after the first failed presentment attempt." *Supervisory Highlights Junk Fees* at 4. Although such repeated submissions are "highly unlikely to succeed" in clearing the transaction, they are nevertheless very common. Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472, 54473, 54508, 54721 (Nov. 17, 2017); *Supervisory Highlights Junk Fees* at 5–6. A returned payment is commonly resubmitted three or more times. *See* 82 Fed. Reg. at 54721, 54724.

In fact, overdraft and NSF fees became so profitable that financial institutions deliberately sought out customers they thought were likely to incur them. *See, e.g.,* Anthony Malakian, *Overdraft and ATM Fees Rise, As Economy Slumps*, American Banker, (June 1, 2008), https://perma.cc/6FSB-EKPW ("Years ago, if you overdrew your

account, we couldn't wait to close your account and throw you out . . . . Now we have to go find those people and bring them in, because they are really valuable folks to have."). By 2007, overdraft revenue represented almost half of banks' total service charge revenue, *see* Noguchi, *Rising Bank Fees Squeeze Consumers*, National Public Radio, (June 26, 2008), https://perma.cc/98EV-LV86. And by 2022, "overdraft and NSF fees comprised 53% of all fees that the institutions [the CFPB monitors] charged to consumer checking accounts." *Supervisory Highlights Junk Fees* at 8. Banks generated over $9 billion in revenue on these fees in 2022 alone. *Id.*

These practices come "at a significant and sometimes unexpected cost to consumers." *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1234 (11th Cir. 2019). And they place an extreme burden on those who live paycheck to paycheck, or "on the margins of solvency"—the very people who depend on checking accounts as an avenue into the financial mainstream. Halperin et al., Center for Responsible Lending, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts* 2 (Jan. 25, 2007), https://perma.cc/L5NM-DC56. These vulnerable consumers pay a disproportionate amount of overdraft fees collected. Overdraft Lending, 89 Fed. Reg. 13852. Nearly seventy percent of heavy overdrafters make less than $50,000 annually; nearly one in four lose at least a week's worth of wages to fees each year. The Pew Charitable Trusts, *Heavy Overdrafters: A financial profile*, at 4–5 (Apr. 2016), https://goo.gl/wdNRHF; *see Supervisory Highlights Junk Fees*

at 8. These fees can place vulnerable consumers in a financial hole they can't climb out of—"cannibalizing already low bank balances" as lenders help themselves to any new deposits consumers place in their accounts. Corkery & Silver-Greenberg, *Overdraft Practices Continue to Gut Bank Accounts and Haunt Customers*, N.Y. Times (Feb. 28, 2016), https://perma.cc/WC5B-YBFJ.

Not satisfied with all of this, even if an accountholder had sufficient funds when they authorized the transaction, some financial institutions still imposed overdraft fees. *Supervisory Highlights Junk Fees* at 6. There is a delay between when a consumer authorizes a transaction, which is when the bank chooses to either pay or decline the transaction, and "settlement." A transaction "settles" when the funds are transferred from the consumer's account to the merchant's. OCC, Payment Systems, Comptroller's Handbook, https://perma.cc/43FE-DVXZ. In the time between a transaction's "authorization" and "settlement," unrelated intervening transactions could settle or put funds on hold, leaving the consumer's balance insufficient to cover the original transaction at the time of settlement. CFPB Circular 2022-06. When this occurs, institutions sometimes charge overdraft fees. This means that even when consumers confirm they have a sufficient available balance in real-time—via mobile application, online, or at an ATM—before authorizing a purchase, they could still incur overdraft fees because of a financial institution's use of complex processing timelines for overlapping transactions. *Id.* These types of fees are called "Authorize-

Positive Settle-Negative" or "Authorize Positive, Purportedly Settle Negative" (often referred to as APPSN) overdraft fees. *See Supervisory Highlights Junk Fees* at 6; SAC, R. 97, PageID#1930.

**B.** **The only way consumers can learn about the details of a bank's overdraft program is through accurate notice.**

Over the past few years, federal agencies have recognized that banks' use of "Authorize Positive, Purportedly Settle Negative" overdraft fees and multiple NSF fees per transaction is often "unanticipated" and "unfair." *Supervisory Highlights Junk Fees* at 3–4. "Consumers would not reasonably anticipate" an overdraft fee for an expense they authorize "when the consumer's available balance is sufficient to cover the transaction." Overdraft Lending, 89 Fed. Reg. at 13858. To the contrary, "consumers may reasonably assume that when they have sufficient available balance in their account at the time they entered into the transaction, they will not incur overdraft fees for that transaction." CFPB Circular 2022-06. Nor do consumers expect banks to assess "an additional fee each time a third party resubmits the same transaction for payment after a bank returns the transaction for non-sufficient funds." OCC Bulletin 2023-12, *Overdraft Protection Programs: Risk Management Practices*, (Apr. 26, 2023), https://perma.cc/AHQ3-YUNX.

When consumers have "no reason to anticipate" an overdraft or NSF fee practice, they have no way to "reasonably avoid incurring" the fees charged. *Supervisory Highlights Junk Fees* at 8. "Even if a consumer closely monitors their account

balances and carefully calibrates their spending in accordance with the balances shown, they can easily incur an overdraft fee they could not reasonably anticipate because financial institutions use processes that are unintelligible for many consumers and that consumers cannot control." CFPB Circular 2022-06. To avoid fees, consumers must rely on the bank's representations to "understand[] how overdraft services provided by their institutions operate." Electronic Fund Transfers, 74 Fed. Reg. at 59035. And because "these policies can be extraordinarily complex," Overdraft Lending, 89 Fed. Reg. at 13857, a bank's account agreement must "clearly explain" the policy to ensure they are not deceptive. OCC Bulletin 2023-12.

Recognizing this, the CFPB has condemned the failure to accurately explain overdraft and NSF fees as "deceptive," "unfair," and harmful to consumers. *See id.*; *Supervisory Highlights Junk Fees*. A bank that has not "sufficiently" explained a particular feature of its overdraft program risks "misleading" a "reasonable consumer[]" over the "circumstances under which overdraft fees would be assessed." CFPB, *Supervisory Highlights* 8 (Winter 2015), https://perma.cc/P629-7HYH; *see* FDIC, *Supervisory Guidance on Multiple Re-Presentment NSF Fees* 1 (Aug. 2022), https://perma.cc/ZKN6-L24Q. Indeed, the most "frequent" and "salient" overdraft-related consumer complaints to federal regulators involve inadequate notice. Borné, Smith, & Anderson, *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products* 8 (May 2016), https://perma.cc/PW2R-NX3G.

Given the sums at stake, accurate notice is not a mere formality. Failing to "prominently" state key features of a bank's overdraft program can lead to a cycle of cascading overdrafts and debilitating fees. *See, e.g.*, *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1127 (N.D. Cal. 2010). Clear "explanations to consumers of the operation, costs, and limitations of an overdraft protection program" are "fundamental to enabling responsible use of overdraft protection" and minimizing "potential consumer confusion and complaints." Joint Guidance on Overdraft Protection Programs, 70 Fed. Reg. 9127, 9131 (Feb. 24, 2005).

## II. Factual background

Veronica Gardner is a former customer of Flagstar Bank who was repeatedly subjected to the bank's misleading fee practices. Ms. Gardner opened a checking account with Flagstar on February 1, 2016. Gardner Signature Card, R. 105-18, PageID#2497–98. When she opened her account, it was governed by Flagstar's January 2015 Account Agreement, which includes various terms, conditions, and promises about the account. SAC Ex. A, R. 97-1, PageID#1960. As relevant here, the Agreement makes two promises relating to the imposition of "Authorize Positive, Purportedly Settle Negative" (APPSN) overdraft fees and NSF fees.[2]

---

[2] Years later the bank amended its contract, but it is the 2015 version that is at issue in this appeal.

**1.** The first promise relates to APPSN transactions. The contract assures

consumers that Flagstar will not assess overdraft fees on transactions that are covered

by the available balance in a costumer's account when the transaction was

authorized.

> To begin, the agreement provides definitions of certain key terms:
>
> *Available Balance* is your Balance minus any pending debit card transactions and/or any outstanding holds (for example, holds on deposited checks, fraud/legal holds, or temporary debit authorization holds). …
>
> On debit card purchases, merchants may request a *temporary debit authorization* hold on your account for an amount that may differ from the actual amount of your purchase. This temporary debit authorization hold reduces your Available Balance unless and until: (1) we release it after two business days; or (2) before we release the temporary debit authorization hold, the merchant provides to us the actual amount of the purchase and we are able to adjust your account to reflect the actual purchase amount.

SAC Ex. A, R. 97-1, PageID#1963–65 (emphasis added).

The contract then explains what happens when a transaction is authorized on

a positive account balance. It says that Flagstar will place a temporary authorized

hold to reserve the funds required to cover the pending transaction, and that those

funds (1) will not be used to cover other transactions and (2) will not result in overdraft

fees for the current transaction:

> [A] temporary debit authorization creates a hold on the account that reduces your Available Balance by the amount of the authorization, even if the amount of the transaction is more or less when it is finally posted. While pending, the temporary debit authorization hold could

> lead to other pending or future transactions (1) being returned for nonsufficient funds if we do not pay them, (2) contributing to an overdraft if we do pay them, or (3) being declined if the transaction is a debit/ATM card purchase and you have not authorized us to pay overdrafts for debit/ATM card transactions.

SAC Ex. A, R. 97-1, PageID#1981. And the bank confirms this approach by telling customers they will see their "available balance" decreased to reflect the amount on hold. SAC Ex. A, R. 97-1, PageID#1965. ("A temporary debit authorization hold affects your Available Balance").

**2.** The contract also tells consumers that the bank will charge one NSF fee per transaction. For example, it informs consumers that:

> At our discretion, to avoid overdrawing or causing your account to become further overdrawn, we may return (i.e., not honor) any non-sufficient funds transaction. If we do not honor such a transaction, we may assess *a non-sufficient funds fee* against your account.

SAC Ex. A, R. 97-1, PageID#1968 (emphasis added). A few pages later the contract again promises that if the bank "refuse[s] to pay an overdraft item … You will be charged *an NSF fee* for each item returned." SAC Ex. A, R. 97-1, PageID#972 (emphasis added).

Elsewhere, the contract likewise reinforces this policy. In describing its Bounce Protection program (which the Bank claims provides a "safety net up to an automatically assigned overdraft limit"), for instance, it again informs customers that only one NSF per transaction will be applied:

> Overdrafts above and beyond your established Bounce Protection Limit may result in checks or other items being returned to the payee. The Non-Sufficient Fee (NSF) will be charged per item and assessed to your account. …
>
> [T]he amount of the overdraft transaction plus our NSF fee for each item will be deducted from your Available Balance and Bounce Protection Limit. If the item is returned, the NSF fee will be deducted from your account and reflected in your Available Balance.

SAC Ex. A, R. 97-1, PageID#1976–77.

Flagstar's Fee Schedule confirms this. It provides that the bank will charge a "Non-Sufficient Funds (NSF) Charge (each)" for $36, and that the bank will levy such "[a] charge for an overdraft or returned item for all checking, money market, and savings accounts other than SimplyOne." SAC Ex. A, R. 97-1, PageID#1993.

**3.** Despite these assurances, Flagstar has admitted that it assesses the very type of "Authorize Positive, Purportedly Settle Negative" overdraft fees that the CFPB and OCC warned can be "unfair." *See* Barlow Dep., R. 113-1, PageID#3091 (Flagstar admitting it has been applying that practice since 2016). Here, the bank first charged Ms. Gardner APPSN overdraft fees less than a year after she opened her account. *See* Decl. of Arthur Olsen, R. 112-6, PageID#2997 (Ms. Gardner was assessed an overdraft fee for an APPSN transaction on September 24, 2016).

Flagstar has also admitted to charging multiple NSF fees on the same transaction. *See* Def.'s MSJ, R. 105, PageID#2191. For example, on December 13, 2019, Ms. Gardner attempted to authorize an ACH transaction for $86.13 but had

16

insufficient funds in her account. *Id.* at PageID#2185. Flagstar rejected the payment and assessed an NSF fee. *Id.* But unbeknownst to Ms. Gardner, and without her request, Flagstar later re-processed and rejected that same transaction twice more. Gardner Dep., R. 105-3, PageID#2257. Even though Flagstar had already determined that the account lacked sufficient "available" funds to cover the transaction, each time it reprocessed the transaction it charged her another fee. Decl. of Arthur Olsen, R. 112-6, PageID#82998. In total, she was assessed $108 in non-sufficient fund fees for authorizing one ACH transaction for less than $90. *Id.*

## III. Procedural history

Ms. Gardner filed this putative class action on July 31, 2020. She alleged that two of Flagstar's practices—charging overdraft fees on APPSN transactions and assessing multiple NSF fees on the same transaction—breached the terms of its written agreement with consumers under Michigan law. SAC, R. 97, PageID#1927. She also claimed that these practices breached the covenant of good faith and fair dealing. *Id.* at PageID#1953. And she sought to recover damages that she and the class had suffered since July 31, 2014, as well as injunctive relief to require Flagstar to stop charging these fees. Def.'s MSJ, R. 105, PageID#2175; SAC, R. 97, PageID#1929, 1934.[3]

---

[3] Ms. Gardner also brought a Michigan statutory claim that is not at issue in this appeal. SAC, R. 97, PageID#1954.

**A.    The district court denies Flagstar's motion to dismiss.**

**1.** Flagstar initially sought to dismiss Ms. Gardner's contract claims. It argued that the terms of its contract unambiguously permitted the challenged APPSN and multiple fees practices. Def.'s MTD, R. 18, PageID#150–52.

To support its theory that the contract unambiguously authorized the assessment of APPSN fees, Flagstar pointed to language stating: "Your account is overdrawn … if we pay an Item for more money than your Available Balance." Def.'s MTD, R. 18, PageID#163. Flagstar argued that the contract's use of the word "pay" in this sentence made "clear" to a consumer that Flagstar will assess whether to impose an overdraft fee only after a transaction settles—regardless of whether the transaction was authorized on a positive balance. *Id.* And it asserted that the contractual language promising consumers it will put "a temporary debit authorization hold" on an "account that reduces the Available Balance … by the amount of the authorization" does not mean that funds are "set aside or removed from the account to later reconcile a pending transaction." *Id.* at PageID#161–62. The bank did not quote any contractual language to support that assertion.

Flagstar also claimed that the contract unambiguously authorized it to assess multiple NSF fees on the same transaction. Flagstar agreed with Ms. Gardner that the contract only permitted a single fee to be assessed per "item." *Id.* at PageID#165. But it argued that the statement "Items are intended to refer to any debits against

18

your account" gave sufficiently clear notice to consumers that an "item" means *each presentment* of a transaction. *Id*. And, according to the bank, "each presentment" or re-presentment of the same transaction is a new "item" that can be assessed a new NSF fee. *Id.*

**2.** In response, Ms. Gardner disputed that Flagstar's interpretation of the contract was unambiguous and set out why her reading of the contract was, at minimum, plausible.

*First*, she explained why it was reasonable for a consumer to think that, when they authorized a transaction that was covered by the available balance in their account, no overdraft fee would be assessed. She pointed to the provision promising consumers that when they authorize transactions on a positive balance, Flagstar will place a "temporary debit authorization [that] creates a hold on the account that reduces your Available Balance by the amount of the authorization." Pl.'s Resp. to MTD, R. 20, PageID#230 (quoting FAC Ex. A, R. 14-1, PageID#117). She then explained how the contract promised to keep those funds off-limits to other transactions before the initial transaction settled. The contract told consumers that if additional transactions are made in an amount greater than this new "available balance" before the "hold is released," "the transaction presented for payment will be: (1) a non sufficient funds (NSF) transaction," "(2) an overdraft transaction," or "(3) declined." *Id.* (quoting FAC Ex. A, R. 14-1, PageID#101). Since the bank promised to

19

reserve the necessary funds to cover a transaction made on a positive account balance, there was no reason to expect a transaction to incur an overdraft fee. *Id.*

*Second*, she explained why it is reasonable to read the contract's promise that that a single fee will be assessed "per item" to refer to each time an accountholder made an order or instruction for payment, not each time that one transaction is re-processed by a bank or merchant. Pl.'s Resp. to MTD, R. 20, PageID#215, 220. The word "item" means an "order to pay money handled by a bank for collection or payment." *Id.* at PageID#221 (citing Item, Black's Law Dictionary and M.C.L.A. § 440.4104(1)(i)). And courts across the country have agreed that "item" in this context is reasonably understood to mean a customer-authorized transaction, not each presentment of that same transaction. *See id.* at PageID#216 (citing *e.g.*, *Roy v. ESL Fed. Credit Union*, 2020 WL 5849297, at *9 (W.D.N.Y. Sept. 30, 2020)).

**3.** The district court denied Flagstar's motion to dismiss, holding that, because both parties' interpretations of the contract were plausible, the contract was ambiguous and did not clearly authorize Flagstar to engage in the two challenged practices. MTD Op., R. 32, PageID#645, 652–53.

*First*, the court agreed with those "[f]ederal courts across the country [that] have been presented with similar or identical APPSN Transaction claims" and ruled that similarly worded contracts are ambiguous. *Id.* at PageID#646. As the district court explained, courts across the country have repeatedly held that a contract's

statement that a bank will put funds "for a transaction authorized with positive funds" on "hold" can "be fairly read to" mean the funds are being reserved for "settlement with the merchant." *Id.* at PageID#646–47 (quoting *Lloyd v. Navy Fed. Credit Union*, 2018 WL 1757609, at *7 (S.D. Cal. Apr. 12, 2018)). Given this, "'it would hardly be implausible for a consumer to think that … the [overdraft] assessment of whether their account holds sufficient funds refers to the funds available at the time that the consumer-merchant transaction is authorized by' the defendant bank, not when the transaction is settled days later." *Id.* at PageID#648 (quoting *Roberts v. Cap. One, N.A.*, 719 F. App'x 33 (2nd Cir. 2017)). So, the court held, the contract "could reasonably" be understood "to preclude Flagstar from assessing overdraft fees when the initial transaction is made with a positive account balance." *Id.*

*Second*, the court held that the contract did not unambiguously permit Flagstar to charge multiple NSF fees on a single transaction. The court observed that multiple contractual provisions "support[]" an interpretation that a transaction does not become a new item when it is reprocessed by a merchant. *Id.* at PageID#651. And the court followed the "overwhelming[]" majority of courts considering similar language in holding that it could "reasonabl[y]" be read to only permit one overdraft fee for each transaction. *Id.* at PageID#652–53 (collecting cases).

**B.    The district court grants Flagstar's motion for summary judgment.**

**1.** After the parties engaged in discovery, Flagstar moved for summary judgment. Flagstar claimed, for the first time, that it had mailed Ms. Gardner an updated disclosure guide in 2017 that eliminated any perceived ambiguity in the contract in favor of Flagstar's reading. Def.'s MSJ, R. 105, PageID#2183. It argued that the "updated language" in the guide made clear that the contract permitted the type of challenged APPSN fees here. *Id.* at PageID#2179–80, 2190. And the bank asserted that it put consumers "on notice" that they could be charged multiple NSF fees on the same transaction. *Id.* at PageID#2191. In support of that assertion, the bank pointed to an "updated" definition of the term "item":

> "Item" means any order, instruction or authorization to pay, transfer or withdraw funds or money from your account including, but not limited to, checks substitute checks, preauthorized drafts, withdrawal tickets, transfers, electronic debits, imaged debits, wire transfers, ATM debits, ACH debits, bill pay debits, photocopy debits, bank generated debits, and debit card point of sale transactions.

*Id.* at PageID#2180.

Even so, Flagstar recognized that the court might still find the updated contract ambiguous. So it asserted that, regardless of whether the contract was ambiguous, its interpretation should still control as a matter of law. *Id.* at PageID#2197. In the bank's view, that was because Ms. Gardner "did not read the Agreement, she only briefly skimmed it." *Id.* at PageID#2198. At her deposition, Ms.

Gardner testified that she had "read [the contract] over," but that "it was years ago" and she couldn't "remember everything it said." Gardner Dep., R. 105-3, PageID#2242; *see id.* at PageID#2242–43 (explaining that she "glanced and skimmed and briefly read" the contract but that she "wasn't trying to memorize it," and "didn't think I'd be, you know, tested on [it] word for word later on"). She did, however, testify to her general understanding that when she opened the account a non-sufficient fund fee would be assessed only "when there is not enough money in the account at the time of the transaction." *Id.* at PageID#2243. But, according to the bank, her failure to thoroughly parse the language of the contract meant that any ambiguity in the plain language of the contract could not be resolved in her favor. Def.'s MSJ, R. 105, PageID#2197.

**2.** Ms. Gardner responded that Flagstar's updates to the contract—which didn't become effective until February 2018—were unlawful. Pls.' Opp'n to MSJ, R. 110. But even if the updates were valid, Flagstar still was not entitled to summary judgment. *Id.* PageID#2787–88. Ms. Gardner explained that any updates to the contract could not affect her claims about overdraft fees on APPSN transactions that Flagstar charged her and the class before February 2018. *Id.* at PageID#2787. The old contract governed those claims and the district court had already held that version of the contract ambiguous. *Id.* Nor, she explained, was Flagstar entitled to summary judgment on her multiple NSF fees claims under either version of the contract. The

updated language did not materially change the contractual provisions that the court had already held failed to clearly permit multiple NSF fees on the same transaction. *Id.* at PageID#2798.

Ms. Gardner also noted that no principle of contract law prevented a court from adopting an interpretation of an otherwise ambiguous contract based on how thoroughly a party had parsed its terms. And she explained that "extrinsic evidence of individual understandings is especially irrelevant" to determining the meaning of an ambiguous "standard form contract[]" like Flagstar's. *Id.* at PageID#2803–04 (quoting *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017)). That's "because unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties to a contract." *Id.* at PageID#2803 (quoting *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 436–37 (1st Cir. 2013)).

**3.** The district court granted Flagstar's motion for summary judgment. The court found that Flagstar had produced sufficient evidence to show that the "February 5, 2018 Agreement was effective and lawful." MSJ Op., R. 137, PageID#4452–53, 4449. And it held that the updated language clarified Flagstar's APPSN fee policy so that "Flagstar's interpretation of the Agreement is consistent with the written language." *Id.* at PageID#4460. The court therefore concluded that, since the update, Flagstar's practice of assessing overdraft fees on APPSN transactions was permissible. *Id.*

But the court also recognized that the updated language did not affect Ms. Gardner's claims about APPSN transactions made before the update in 2018. *See id.* at PageID#4468. And it reminded the parties that, in its opinion denying Flagstar's motion to dismiss, it held that the original "Agreement is not unambiguously clear about whether an [overdraft]/NSF Fee may be assessed on an APPSN Transaction, and Plaintiff could reasonably understand the Agreement's terms to preclude Flagstar from assessing overdraft fees when the initial transaction is made with a positive account balance." *Id.* at PageID#4445.

The court also held that, notwithstanding the updates to the contract, there was still "existing ambiguity" about whether Flagstar could assess multiple NSF fees per transaction. *Id.* at PageID#4458, 4467. The court reiterated that the original "Agreement's language … lends itself to two reasonable interpretations of 'item' and whether the Agreement permits multiple [overdraft]/NSF Fees on all presentments or resubmissions associated with a single transaction." *Id.* at PageID#4446. And it explained that, although the updated contract provided a new definition for the term "item," that change did not unambiguously permit the bank's multiple NSF fee practice. *See id.* at PageID#4458, 4467.

Despite these contractual ambiguities, the court granted summary judgment to Flagstar. To reach that conclusion, the court relied on a line from *Pritts v. JI Case Co.*, stating that "a party who has not read the contents of a contract before signing

it may not claim that his intention was different from that stated in the writing." *Id.* at PageID#4464–65 (quoting 310 N.W.2d 261 (Mich. Ct. App. 1981) and citing *Komraus Plumbing & Heating Inc. v. Cadillac Sands Motel, Inc.,* 195 N.W.2d 865 (Mich. 1972)). In the district court's view, that meant any "existing ambiguity" in a contract "cannot be resolved in [] favor" of a plaintiff who fails to introduce sufficient extrinsic evidence that they thoroughly reviewed the contract before agreeing to it. *Id.* at PageID#4467–68. The court recognized that Ms. Gardner "did review the fee schedule." *Id.* at PageID#4466. But it also observed that she did "not remember reviewing any specific" definitional provisions and cannot "show that she reviewed any section of the contract that includes the[] terms" at issue. *Id.* at PageID#4465–66. In the court's view, that required the adoption of Flagstar's interpretation as a matter of law—even though the court identified no relevant extrinsic evidence that Flagstar had introduced either.

Finally, after granting summary judgment to Flagstar on the contract claims, the court also dismissed Ms. Gardner's claim for breach of the implied covenant of good faith and fair dealing because it could not stand alone without a viable contract claim. *Id.* at PageID#4468.[4]

---

[4] The court also granted summary judgment against another named plaintiff, Calvin Morgan, for lack of standing. *Id.* at PageID#4447. That decision is not on appeal here.

## STANDARD OF REVIEW

This Court reviews a "district court's grant of summary judgment *de novo*." *Thacker v. Ethicon, Inc.*, 47 F.4th 451, 458–59 (6th Cir. 2022). Summary judgment is only proper if no "rational trier of fact [could] find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When evaluating a motion for summary judgment, this Court views the evidence in the light most favorable to the party opposing the motion." *Thacker*, 47 F.4th at 459.

## SUMMARY OF ARGUMENT

**I.** The district court's grant of summary judgment to Flagstar regarding its assessment of APPSN fees under the bank's 2015 contract was error. The court found that Flagstar's contract, before it was updated in 2018, did not unambiguously permit the assessment of overdraft fees based on the account balance at the time a transaction settles, instead of when it is authorized—meaning that the contract was ambiguous and open to two reasonable competing interpretations. But the court nonetheless held, as a matter of law, that (1) it could not even consider the non-drafter consumer's interpretation because she lacked the necessary extrinsic evidence to support it, and (2) that, in the absence of any relevant extrinsic evidence, the contract must be construed in favor of the drafter—Flagstar. *See* MSJ Op., R. 137, PageID#4464–65. No understanding of Michigan law supports the district court's approach.

**A.** In Michigan, just like in other jurisdictions, parties are not required to introduce extrinsic evidence to advance a reasonable interpretation of an ambiguous contract. The Michigan Supreme Court has made this clear. In *Klapp*, it explicitly recognized that a party need "not present any extrinsic evidence [that] favors its construction" to advance its interpretation of an ambiguous contract. 663 N.W.2d at 455, 459 n.20; *see also Royal Ins. Co. of Am. v. Orient Overseas Container Line, Ltd.*, 525 F.3d 409, 415, 424–25, 430 (6th Cir. 2008) (recognizing this fundamental rule and applying it to an ambiguous contract in the absence of relevant extrinsic evidence). Especially when it comes to form contracts, such a rule make sense because these contracts are typically not "the subject of any negotiations" so there is often little extrinsic evidence explaining the parties' intent. *See Fifth Third Mortg.-MI, L.L.C. v. Hance*, 2011 WL 4501573, at *5 (Mich. Ct. App. Sept. 29, 2011).

And, in the absence of any relevant extrinsic evidence, the "tie-breaker" rule that applies is a construction against—not in favor of—the drafter. *Klapp*, 663 N.W.2d at 455. If the meaning of an ambiguous contract cannot be resolved by considering extrinsic evidence or applying any other applicable "rules of contract construction," the "rule of contra proferentem" requires that any ambiguities "be construed against the drafter of the contract." *Id.* at 454–55.

**B.** The district court turned these established rules on their head. It held that Ms. Gardner was barred from advancing her interpretation of Flagstar's ambiguous

contract because she did not have sufficient extrinsic evidence to support it. And even though the court identified no extrinsic evidence that Flagstar had produced to support its interpretation, the court nevertheless held, as a matter of law, that the drafter's interpretation controls in the absence of any relevant extrinsic evidence.

**1.** To support its decision, the district court mistakenly relied on the principle that "a party who has not read the contents of a contract before signing it may not claim that his intention was different from that stated in the writing." *Pritts v. JI Case Co,* 310 N.W.2d 261, 265 (Mich. Ct. App. 1981). But as the cases the district court cited illustrate, that principle applies to contracts that are unambiguous on their face; it does not extend to cases, like this one, where the text of a contract is itself ambiguous. Indeed, such a rule cannot apply to ambiguous contracts because, by definition, what's "stated in the writing" is not clear.

**2.** The district court's approach is not only wrong, it also makes little sense. Form contracts "do not derive from the negotiations of the specific parties to a contract," *Kolbe,* 738 F.3d at 436–37, so "[e]xtrinsic evidence of the parties' unique intentions" is "generally uninformative," *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir. 1982). And the district court's belief that extrinsic evidence of how a party understood certain contractual language is required would be hard to administer in practice. Here, for instance, Ms. Gardner had actually

skimmed and briefly read the contract, yet the court faulted her for failing to precisely recall her understanding of specific provisions years later.

**3.** Had the district court correctly applied Michigan contract law, it would have denied Flagstar's motion for summary judgment. In Michigan, "[t]he interpretation of a contract whose language is ambiguous is a question of fact for the jury to decide." *Klapp*, 663 N.W.2d at 459. And "if, after the jury has considered all conventional means of contract interpretation and all relevant extrinsic evidence, it is still unable to determine what the parties intended, the jury should then construe the ambiguity against the drafter." *Id.* at 460.

**II.** The same fundamental error infects the district court's analysis of the second ambiguity in Flagstar's contract. The district court also held that Flagstar's contract was ambiguous about whether the bank was authorized to charge more than one NSF fee per transaction. But, after recognizing this ambiguity, the court again held that it was required as a matter of law to construe that ambiguity in favor of Flagstar. That was wrong for the same reasons: Michigan law does not require a party to produce any extrinsic evidence to support their interpretation of an ambiguous contract and the rule that applies in the absence of any relevant extrinsic evidence is a construction against—not in favor of—the drafter.

**III.** Because the district court dismissed Ms. Gardner's implied covenant claim solely on the basis that it could not proceed without a breach of contract claim,

reversing the district court's grant of summary judgment on the contract claims likewise requires reversal on the implied covenant claim as well. As this Court has explained, when an implied covenant claim is dismissed "on the basis that [it] could not exist in the absence of an enforceable contract," it should be revived if the contract claim is revived as well. *Source Assocs., Inc. v. Valero Energy Corp.*, 273 F. App'x 425, 429 (6th Cir. 2008). That rule applies here.

## ARGUMENT

### I. The district court erred in holding that, because Ms. Gardner did not introduce sufficient extrinsic evidence of intent, the ambiguity in Flagstar's contract regarding the assessment of APPSN fees must be resolved in favor of the drafter.

The district court in this case held that, by its terms, Flagstar's 2015 contract did not unambiguously authorize the bank to assess overdraft fees at the time a transaction settles. Instead, the court explained, the contract could be "reasonably interpreted" to permit the assessment of overdraft fees "at the time of authorization," not "at the time of payment and settlement." MTD Op., R. 32, PageID#649; *see also id.* at PageID#646–48 (noting that the contract could "be fairly read" as only permitting Flagstar to assess an overdraft fee based on "the funds available at the time that the consumer-merchant transaction is authorized," "not when the transaction is settled days later"). The court, in other words, held that the contract was ambiguous and subject to two competing reasonable interpretations.

But the court then held that it was required to construe that contractual ambiguity in favor of Flagstar—the drafter of the form contract. In the court's view, Michigan law prohibits a non-drafting party from "advanc[ing] an interpretation [of an ambiguous] contract" without sufficient extrinsic evidence of their "understanding of the agreement" at the time of "signing." MSJ Op., R. 137, PageID#4464–66. What's more, the court ruled that, in the absence of any relevant extrinsic evidence, the drafter's interpretation controls. MSJ Op., R. 137, PageID#4467–68 (holding that the "existing ambiguity … cannot be resolved in [the non-drafter's] favor").

That was error. To resolve contractual ambiguities, Michigan law does not require parties to submit extrinsic evidence regarding their intent at the signing. And that is especially true for form contracts. Nor does Michigan law permit a court, in the absence of any extrinsic evidence, to adopt a canon of construction *in favor* of the drafter—it is, in fact, just the opposite. Because the district court departed from controlling Michigan contract law, its grant of summary judgment to Flagstar on Ms. Gardner's APPSN fee claims under the original contract should be reversed.

### A.   Michigan law does not require extrinsic evidence to resolve the meaning of an ambiguous contract and does not permit the adoption of a pro-drafter canon of construction.

In Michigan—just like in other jurisdictions—"[t]he interpretation of a contract whose language is ambiguous is a question of fact." *Klapp*, 663 N.W.2d at

459. In some cases, answering that question involves the consideration of "relevant extrinsic evidence," including evidence "indicat[ing] the contemporaneous understanding of the parties" like "the parties' conduct, the statements of its representatives, and past practice." *Id.* at 454. But Michigan law does not *require* a party to produce this type of extrinsic evidence before advancing an interpretation of an ambiguous contract. And a factfinder is not *foreclosed* from adopting an interpretation of an ambiguous contract in the absence of any relevant extrinsic evidence. Just the opposite: In cases where "the parties' intent cannot otherwise be determined through resort to relevant extrinsic evidence," a factfinder remains free to decide which of two plausible interpretations controls. *Id.* at 460.

The Michigan Supreme Court's decision in *Klapp* makes this clear. In that case, one party failed to produce "any extrinsic evidence … that favor[ed] its construction" of an ambiguous contract. *Id.* at 459 n.20. Even so, the Court held that this did not bar that party from advancing its interpretation of the contract or otherwise prevent a factfinder from considering whether such an interpretation should control. *Id.*; *see also Waterworth v. Ekman*, 2016 WL 1175099, at *3 (Minn. Ct. App. Mar. 28, 2016) (noting the absence of "any caselaw" to support the position that a court is "obligated to give effect to the intention of only one party if the other party's intention is unknown"). To the contrary, where "the relevant extrinsic evidence" remains insufficient to ascertain "what the parties intended," a factfinder is still

33

permitted to evaluate both interpretations and choose between them. *Klapp*, 663 N.W.2d at 456.

This Court, too, has likewise recognized this basic rule of Michigan contract law. In *Royal Insurance Co. of America v. Orient Overseas Container Line Ltd.*, for instance, the parties failed to "produce[] any evidence as to their contractual intent" to support their competing interpretations of an ambiguous contract. 525 F.3d 409, 425, 430 (6th Cir. 2008). But that did not somehow bar the parties from advancing their preferred interpretation of an ambiguous contract or foreclose a court from considering it. Instead, even where no evidence could "illuminate the party's intent" regarding the meaning of an ambiguous contract, this Court considered both sides' interpretations before choosing among them. *Id.* at 424–25; *see Lomree, Inc. v. Pan Gas Storage, LLC*, 499 F. App'x 417, 420–24 & n.6 (6th Cir. 2012) (holding that a party can still advance, and a factfinder can still adopt, an interpretation of an ambiguous contract even in the absence of any relevant extrinsic evidence of the party's intent).

This understanding makes sense. As Michigan courts have explained, relevant extrinsic evidence is not the only tool available to a factfinder for resolving an ambiguous contract. *See Klapp*, 663 N.W.2d at 453–54. Where no relevant extrinsic evidence exists, or where a factfinder is "unable to discern the parties' intent from the extrinsic evidence," the question can be answered by looking to "the contract's terms, in light of the apparent purpose of the contract as a whole," as well as other

"rules of contract construction." *Id.* at 454, 459; *see also Royal Ins. Co.*, 525 F.3d at 422 (noting that a factfinder can look to "evidence of the surrounding circumstances and the practical construction of the parties"). And the court in *Klapp* made clear that the rule of contract construction that controls in cases where "the parties' intent cannot otherwise be determined through resort to relevant extrinsic evidence" is the "rule of contra proferentem." 663 N.W.2d at 459–60. In such a case, a factfinder "should construe any ambiguities against the drafter of the contract." *Id.* at 454–55, 460; *Lomree*, 499 F. App'x at 424 (noting that where "the evidence remains insufficient to ascertain the parties' intent," it would be "correct[]" to "apply the doctrine of *contra proferentem*"); *see also Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 786–87 (Mich. 2003) (same).

This rule undoubtedly applies to form contracts—not least because contracts with "boilerplate language" are frequently not "the subject of any negotiations." *Fifth Third Mortg.*, 2011 WL 4501573, at *5 (applying this rule and, in the absence of any extrinsic evidence, construing an ambiguous contract against the drafter); *JP Morgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 2011 WL 5075669, at *4 (E.D. Mich. Oct. 26, 2011) (adopting the non-drafter's interpretation of an ambiguous contract where there was "no extrinsic evidence to reveal what the parties intended"). Indeed, this Court has applied this rule to a form contract. *See Royal Ins.*, 525 F.3d at 415, 423–26 (noting that, because the terms of the contract were "predetermined by [the drafter] and not

open for negotiation," the parties had failed to "produce[] any evidence as to their contractual intent" and as a result applying "the doctrine of *contra proferentum* to construe ambiguities in the contract against … the drafter").

In short, Michigan contract law does not require that parties introduce extrinsic evidence of their initial intent when entering a contract before advancing their interpretation of the contract's ambiguous language. Nor is a factfinder prohibited from adopting such an interpretation in the absence of such extrinsic evidence. Instead, if there is insufficient relevant extrinsic evidence to clarify the meaning of the contract, a factfinder *must* construe any "ambiguities against the drafter of the contract." *Klapp*, 663 N.W.2d at 460. As a result, when a consumer signs a boilerplate form contract without negotiation, and no other relevant extrinsic evidence of the contract's meaning exists, the doctrine of *contra proferentum* applies to resolve any existing ambiguities in favor of the consumer.

**B.**  **The district court erred in holding it could not consider or adopt Ms. Gardner's interpretation because she did not introduce sufficient extrinsic evidence to support her interpretation.**

The district court turned these principles upside down. It held that Flagstar's—i.e., the drafter's—interpretation of the ambiguous contract controlled as a matter of law in the absence of extrinsic evidence of the consumer's intent in signing the contract. But as we just explained, the rule is exactly the opposite. Where "the parties' intent cannot otherwise be determined through resort to relevant

36

extrinsic evidence," any ambiguities must be construed "against the drafter of the contract," not in its favor. *Klapp*, 663 N.W.2d at 460. Nor is it the case, as the district court held, that a party is forbidden from even advancing an interpretation of an ambiguous contract unless they produce this type of extrinsic evidence. *See id.* at 459–60 & 460 n.20 (allowing a factfinder to consider a party's proposed interpretation even where they produced no "extrinsic evidence … that favors its construction").

**1.** In support of its contrary understanding, the district court relied on two Michigan cases—*Pritts,* 310 N.W.2d at 265, and *Komraus*, 195 N.W.2d at 867. *See* MSJ Op., R. 137, PageID#4464–67. In particular, the district court seized on *Pritts*'s statement, which itself relied on *Komraus*, that "a party who has not read the contents of a contract before signing it may not claim that his intention was different from that stated in the writing." *Id.* (quoting *Pritts*, 310 N.W.2d at 265). Applying that statement here, the district court ruled that Ms. Gardner was barred from "advanc[ing] an interpretation to a contract that she did not read" which, in turn, meant that "the existing ambiguity regarding Item Presentment Fees cannot be resolved in her favor." MSJ Op., R. 137, PageID#4467–68.

But these cases address what rules apply when construing a contract that is "clear in its meaning," not what rules apply when a contract is ambiguous. *Komraus*, 195 N.W.2d at 868–69; *see Pritts*, 310 N.W.2d at 265 (citing *Komraus*). Where the contract's meaning is clear on its face, a court may refuse to allow a party to advance

37

an interpretation inconsistent with that meaning unless they introduce sufficient extrinsic evidence of intent to support such an interpretation. *See Pritts*, 310 N.W.2d at 265 (holding that a party without extrinsic evidence cannot argue a contract meant something that is "*different* from that stated in the writing" (emphasis added)); *Komraus*, 195 N.W.2d at 868–69 (noting that this rule applies to a contract that is "clear in its meaning" and "without any uncertainty as to the object or extent").

Such a principle has no bearing on the rules that apply when a contract is ambiguous. Indeed, that is evident from the statement in *Pritts* that the district court relied on—which requires, as an initial matter, that the meaning of a contract be clearly "stated in the writing." When the text of the contract is not clear—because there are two reasonable interpretations of it—no rule of contract law prohibits a party from advancing one of those interpretations unless they also introduce extrinsic evidence. And here, Ms. Gardner never did what *Pritts* forbids; she never claimed that her "intention was different from that stated in the writing." MSJ Op., R. 137, PageID#4465 (quoting *Pritts*, 310 N.W.2d at 265). Instead, she argued that her interpretation was supported by the language of the contract—a conclusion the district court itself adopted. MTD Op., R. 32, PageID#647–48 (agreeing with other courts that Ms. Gardner "sets forth a reasonable interpretation … that would preclude Defendant from assessing overdraft charges on APPSN transactions").

That, standing alone, is enough to warrant reversal of the district court's grant of summary judgment to Flagstar.

**2.** The district court's rule not only finds no support in Michigan law, but it also makes little sense. Requiring courts to analyze exactly how thoroughly a consumer read and understood an ambiguous form contract before permitting them to advance an interpretation would be hard to administer and would waste resources. As numerous circuits have recognized, "unlike individually tailored contracts," uniform form contracts "do not derive from the negotiations of the specific parties to a contract." *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d at 436–37. As a result, "[e]xtrinsic evidence of the parties' unique intentions" is "generally uninformative." *Id.*; *see Sharon Steel Corp.*, 691 F.2d at 1048 (noting that "[b]oilerplate provisions" are "not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties"); *Gillis*, 677 F. App'x at 756 ("In the context of standard form contracts … extrinsic evidence of individual understandings is especially irrelevant."); *see also Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1105 (11th Cir. 2014) (noting the importance of "uniform interpretation of standard contract language" because it "ensures effective functioning of our financial markets, and begets stability").

This case illustrates the point. Although the district court held that Ms. Gardner did "not read the contract," the record undermines that conclusion. For

instance, Ms. Gardner testified that she had "skimmed and briefly read" the contract, though that it "was years ago" and she couldn't "remember everything it said." Gardner Dep., R. 105-3, PageID#2242–43. She also testified to her general understanding that when she opened the account a non-sufficient fund fee would be assessed only "when there is not enough money in the account at the time of the transaction." *Id.* at PageID#2243; *see* MSJ Op., R. 137, PageID#4465–66 ("I agreed to overdraft fees if there was insufficient funds in my account at the time, not overdraft fees, you know, whenever they feel like it."). Yet the district court agreed with Flagstar that she had failed to demonstrate "any such understanding" about the relevant language, which, in its view, meant she was foreclosed from even advancing an interpretation. MSJ Op., R. 137, PageID#4466.[5]

---

[5] In this respect, Ms. Gardner gave more attention to the terms of the form contract than most consumers do to most standardized form contracts. *See* Restatement of the Law, Consumer Contracts § 2 (Am. L. Inst., Tentative Draft No. 2, 2022), Reporters' Notes ("[C]redible empirical evidence, as well as common sense and experience, suggests that consumers rarely read standard contract terms no matter how those terms are disclosed."); Ian Ayres & Alan Schwartz, *The No-Reading Problem in Consumer Contract Law*, 66 Stan. L. Rev. 545, 546–48 (2014) ("Consumers seldom read the form contracts that firms offer," including "credit card and cell phone contracts, insurance policies, gym membership agreements, or mutual fund prospectuses."). Few consumers parse all the provisions of a boilerplate contract before signing, let alone remember reviewing specific provisions in a form contract years later. The district court's holding would therefore prevent most consumers from pursuing contract-based claims against companies that engage in sloppy drafting.

That is not an administrable standard. It would require courts to decide what level of familiarity a consumer had with a form contract before allowing them to advance an interpretation of its terms. And if the district court here were correct, even skimming would be insufficient. It is not even clear if the district court thought reading a contract and only remembering the general point years later without precise descriptions is enough. *See, e.g.*, MSJ Op., R. 137, PageID#4465–66 (recognizing that Ms. Gardner recalled that, when she signed the contract, she understood it to permit only "one fee per transaction"). But a rule requiring courts to make factual determinations about how thoroughly consumers read form contracts years earlier, and how precisely they can remember those contracts, would create unnecessary and fact intensive determinations that are peripheral to the relevant claims.

**3.** Had the district court correctly applied Michigan contract law, it would have denied Flagstar's motion for summary judgment on Ms. Gardner's APPSN claims under the original contract. In Michigan, "[t]he interpretation of a contract whose language is ambiguous is a question of fact for the jury to decide." *Klapp*, 663 N.W.2d at 459. And "if, after the jury has considered all conventional means of contract interpretation and all relevant extrinsic evidence, it is still unable to determine what the parties intended, the jury should then construe the ambiguity against the drafter." *Id.* at 460. Here, the court identified no relevant extrinsic

evidence of either party's intent that supported their interpretation of the ambiguous contract. In such a circumstance, if there is no other relevant evidence to resolve the ambiguity, the factfinder would need to construe the contract "against the drafter"—here, Flagstar. *Id.* At a minimum, then, the district court should have permitted Ms. Gardner's claims regarding Flagstar's assessment of APPSN fees to proceed.

**II.   The district court likewise erred in holding that, because Ms. Gardner lacked evidence of her contractual intent, the contract's ambiguity regarding NSF fees must be resolved in favor of the drafter.**

Although the district court provided comparatively little analysis in holding that Ms. Gardner could not "advance" her interpretation of the contract's NSF fee policy, that holding appears to be based on the same flawed rule that it applied to her APPSN fee claim. MSJ Op., R. 137, PageID#4467–68. The district court recognized that Ms. Gardner's interpretation of Flagstar's contract on NSF fees was "reasonable" because the contract did not unambiguously permit the bank to charge more than one NSF fee on a single transaction. MTD Op., R. 32, PageID#651–53 (noting that an "overwhelming[]" majority of courts have held that similar language could "reasonabl[y]" be read to only permit one overdraft fee for each transaction). Even so, just as with the APPSN claim, the court granted summary judgment to Flagstar on the theory that Ms. Gardner could not "advance an interpretation to a contract that she did not read." MSJ Op., R. 137, PageID#4467–68. The court ruled

that the contract's "ambiguity" could not therefore "be resolved in [Ms. Gardner's] favor," and instead adopted Flagstar's interpretation. *Id.*

This was error for the same reasons explained above. No Michigan authority supports the district court's rule that a party who fails to "read" a contract thoroughly enough is prohibited from advancing their interpretation of an ambiguous contract. To the contrary, Michigan law does not require parties to introduce *any* evidence of their initial understanding when signing a contract to advance an otherwise reasonable interpretation. *See supra* I.A; *Klapp*, at 459 & n.20; *Royal Ins.*, 525 F.3d at 413, 425–30. Indeed, when there is no relevant extrinsic evidence, rather than refuse to adopt the non-drafter's interpretation, courts construe any ambiguities in their favor. *See supra* I.A.; *Wilkie*, 664 N.W.2d at 786–87 (explaining that when "a contract is ambiguous and the parties' intent cannot be discerned from extrinsic evidence, the contract should be interpreted against the [drafter]").

Just like its earlier holding, the district court appears to have based its conclusion on the same line from *Pritts*. But, as explained above, the district court mistakenly relied on a rule that applies to foreclose interpretations that are inconsistent with contracts that are clear on their face, not to reasonable interpretations of ambiguous contracts. Were it otherwise, courts would have no need to apply the doctrine of *contra proferentem* to resolve ambiguities in a contract where "the relevant extrinsic evidence" remains insufficient to ascertain "what the

43

parties intended"—and yet the doctrine is commonly applied. *Klapp*, 663 N.W.2d at 456; *see supra* I.A. So again, *Pritts'* statement that "a party who has not read the contents of a contract before signing it may not claim that his intention was *different* from that stated in the writing" simply does not apply here—Ms. Gardner's interpretation is not "different from that stated in the writing." *See* MSJ Op., R. 137, PageID#4464–65 (quoting *Pritts*, 310 N.W.2d at 265) (emphasis added).

In short, Flagstar's "sloppy drafting"—which created the existing ambiguities—cannot be held against Ms. Gardner. *See Royal Ins.*, 525 F.3d at 424. Because her interpretation of the contract is "reasonable," MTD Op., R. 32, PageID#652–53, the district court was wrong to hold that she was forbidden from advancing her interpretation. As a result, the district court's grant of summary judgment to Flagstar on Ms. Gardner's NSF claim should be reversed as well.

## III. The district court's dismissal of Ms. Gardner's implied covenant claim should be reversed.

Assuming this Court reverses the district court's grant of summary judgment on Ms. Gardner's contract claims, it should likewise reverse the grant of summary judgment on her covenant of good faith and fair dealing claim as well. The "covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v. United of Oakland, Inc.*, 483 N.W.2d 652, 655 (Mich. 1992). As part of her breach of

contract claim, Ms. Gardner alleged that Flagstar violated that covenant by "consistently exercis[ing] [its] discretion to maximize fee revenue." Pls.' Opp'n to MSJ, R. 110, PageID#2805; *see* SAC, R. 97, PageID#1953. The district court dismissed this claim at summary judgment because it could not stand without a breach of contract claim (which were also dismissed at summary judgment). *See* MSJ Op., R. 137, PageID#4468 ("Michigan does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself." (quoting *PTN-NRS, LLC v. Cnty. of Wayne*, 2017 WL 4447016, at *3 (Mich. Ct. App. Oct. 5, 2017))).

As this Court has made clear, implied covenant and breach of contract claims should be revived together in situations like this. *See Source Assocs., Inc.*, 273 F. App'x at 429 (explaining that a plaintiff's covenant claim should be revived along with their breach of contract claim where the district court only dismissed "the implied covenant of good faith and fair dealing [claims] on the basis that they could not exist in the absence of an enforceable contract"). Even the very Michigan appellate court decision that the district court relied on in dismissing Ms. Gardner's implied covenant claims revived the plaintiff's implied covenant claim when it reversed the trial court's order granting summary disposition against the plaintiff's breach of contract claim. *See PTN-NRS, LLC*, 2017 WL 4447016, at *1; *id.* at *11 (Gadola, J., dissenting) (explaining the majority's holding); *see also Hall v. El-Bathy*, 2023 WL

3563021, at *4 (Mich. Ct. App. May 18, 2023) (reviving both claims together); *Sun v. CM Prod., Inc.*, 393 F. App'x 283, 284 (6th Cir. 2010) (applying Kentucky law in reviving both claims). As a result, if this Court overturns the dismissal of Ms. Gardner's breach of contract claims, it should permit her implied covenant claim to proceed as well.

## CONCLUSION

The district court's summary-judgment order should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

TARAS KICK
TYLER DOSAJ
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, CA 90049
(818) 452-6250

November 6, 2024                    *Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,125 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

November 6, 2024

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

# CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Sixth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

# ADDENDUM:
# DESIGNATION OF DISTRICT COURT DOCUMENTS

| Docket No. | Description | PageID |
|---|---|---|
| 1 | Complaint | 1–23 |
| 14-1 | Ex. Flagstar Deposit Agreement 2015 | 97–131 |
| 18 | Defendant's Motion to Dismiss | 140–167 |
| 20 | Plaintiff's Response to Motion to Dismiss | 210–240 |
| 32 | Opinion and Order granting in part and denying in part Defendant's Motion to Dismiss | 635–659 |
| 97 | Second Amended Complaint | 1927–1959 |
| 97-1 | Ex. A Flagstar Deposit Agreement 2015 | 1960–1995 |
| 105 | Defendant's Motion for Summary Judgment | 2162–2208 |
| 105-3 | Veronica Gardner Deposition | 2233–2265 |
| 105-18 | Veronica Gardner Account Agreement with Flagstar Bank | 2497–2498 |
| 110 | Plaintiff's Brief in Opposition to Flagstar Bank's Motion for Summary Judgment | 2765–2811 |
| 112-6 | Declaration of Arthur Olsen in Support of Plaintiff's Opposition to Motion for Summary Judgment | 2991–3001 |
| 113-1 | Deposition of Taryn Mae Barlow | 3032–3156 |
| 137 | Opinion and Order Granting Defendant's Motion for Summary Judgment | 4442–4472 |

| 138 | Judgment | 4473–4474 |
| 139 | Notice of Appeal | 4475–4477 |